IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 11-cv-01553-WYD

LETICIA BALDWIN for J.N. (a minor),

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

Defendant.

---

**ORDER**

---

I. INTRODUCTION AND BACKGROUND

THIS MATTER is before the Court on review of the Commissioner's decision that denied for a second time a child's claim, through his mother, for supplemental security income ["SSI"] child disability payments. Plaintiff's Opening Brief was filed on November 21, 2011. In lieu of filing a Response Brief, on February 1, 2012, the Commissioner filed a Motion to Remand for Further Administrative Proceedings and an accompanying brief. Plaintiff filed a Reply Brief and Objection to Motion to Remand on February 17, 2012.

The first case before this Court, Civil Action No. 08-cv-02256-WYD, was filed by J.N., a child, through his mother, Leticia Baldwin, seeking review of the Commissioner's decision that denied J.N.'s application for SSI child disability payments on October 16, 2008. At the time of the ALJ's decision in that case, J.N. was eleven years old and the

case had been pending since he was nine.[1] On March 26, 2010, I issued an Order reversing and remanding that case to the Commissioner for further factfinding, after noting numerous errors made by the Administrative Law Judge ["ALJ"] (Transcript ["Tr."]. 192-208.)

Following a second hearing in December 2010 (Tr. 251-67), the ALJ again found that J.N. was not disabled in a decision dated March 28, 2011. (*Id*. 155-72.) The ALJ found at step two that J.N., who was then fifteen years old, has severe impairments of "attention deficit hyperactivity disorder (ADHD) and borderline intellectual functioning." (*Id*. 158.) At step three, the ALJ found that J.N. does not have an impairment or combination of impairments that meets or equals (or functionally equals) one of the listed impairments. (*Id*. 161.) In so finding, the ALJ stated that J.N. did not meet the severity requirements of Listing 112.05 (Mental Retardation), and "does not have the deficits in adaptive functioning as needed under 112.05." *Id*.

This appeal followed, and the Court has jurisdiction over the Commissioner's final decision. *See* 20 C.F.R. § 416.1484(a).

The Commissioner's Motion to Remand concedes that the ALJ's decision at issue is not supported by substantial evidence, and that judgment should be entered in favor of Plaintiff. (Def.'s Memo. in Supp. of Mot. to Remand for Further Administrative Proceedings at 1.) The only issue according to the Commissioner is the choice of remedy – whether this case should be remanded for further proceedings or whether the

---

[1] J.N. was born in February 1996. (Tr. 192.) His initial application for child SSI disability benefits was filed in December 2005, and alleged that J.N. was disabled from birth. (*Id*. 194.) The ALJ's decision denying disability benefits to J.N. regarding that application was made on August 2, 2007. (*Id*. 195.)

case should be reversed with an order for payment of benefits. For the reasons stated below, this case is reversed with an order for the immediate payment of benefits. Defendant's motion to remand is denied.

## II. ANALYSIS

### A. Standard of Review

A Court's review of the determination that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standard and whether the decision is supported by substantial evidence. *Hamilton v. Sec. of Health and Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion. *Brown v. Sullivan*, 912 F.2d 1194, 1196 (10th Cir. 1990). "It requires more than a scintilla of evidence but less than a preponderance of the evidence." *Gossett v. Bowen*, 862 F.2d 802, 804 (10th Cir. 1988). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### B. Whether the ALJ Erred at Steps Two and Three in Finding that J.N. Did Not Meet the Requirements of Listing 112.05

#### 1. Introduction

J.N., through his mother, claims that the results of Dr. Marten's IQ tests established that he met the presumptively disabling requirements of mental retardation

for children as set forth in Listing 112.05C of the federal regulations. Further, it is argued that the ALJ's decision to reject the results of Dr. Marten's IQ testing in favor of the school testing is the crux of error in this case. Plaintiff points out that this is the same error that was made in the first decision of the ALJ that was reversed.

As noted above, the Commissioner acknowledges that the ALJ's finding that J.N. does not meet Listing 112.05C and D is not supported by substantial evidence. Nevertheless, he argues that further development of the record and additional fact finding are necessary. Thus, he requests that the case be remanded to the agency.

Turning to my analysis, in order to meet the mental retardation listing, a claimant must satisfy "the diagnostic description in the introductory paragraph and any one of the six sets of criteria." 20 C.F.R. pt. 404, subpt. P., app. 1, § 112.00(A). The diagnostic description in Listing 112.05 states that mental retardation is "[c]haracterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning". If that description is satisfied, the claimant must also meet the criteria of either part A, B, C, D, E, or F of that listing.

2. Whether J.N. Meets the Diagnostic Description of Mental Retardation

I first address the ALJ's finding that Plaintiff does not meet the diagnostic description in the introductory paragraph of Listing 112.05 because "he does not have the requisite deficits in adaptive functioning. . . ." (Tr. 160.) As a result, the ALJ found that J.N. has borderline intellectual functioning rather than mental retardation. (*Id*. 158-160.)

As noted by the Commissioner in his Motion to Remand, "[a]daptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting." Def.'s Mot. to Remand at 6 (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed. text rev. 2000)) ["DSM-IV"]. To be diagnosed with mental retardation under the DSM-IV, an individual must have "significant limitations in adaptive functioning in at least two of the following skills areas: communication, self-care, home living, social/interpersonal skills, use of community resource, self-direction, functional academic skills, work, leisure, health, and safety." *Id*.

The Commissioner asserts that the evidence as to whether J.N. has deficits in adaptive functioning is "equivocal", and that "[t]he judgment of [a medical consultant or a psychological consultant] is necessary to affirm that adaptive behavior is consistent with IQ test results." (Def.'s Mot. to Remand at 6.) In support of this argument, the Commissioner points to the fact that Dr. Marten, the psychological consultant retained by the ALJ, diagnosed both mild mental retardation and possible borderline intellectual functioning. This shows, according to Defendant, that Dr. Marten was unsure whether J.N. had the requisite deficits in adaptive functioning as required for a mental retardation finding. The Commissioner also argues that without knowledge of J.N.'s particular age group, sociocultural background, and community setting, it is unclear whether the facts cited by Plaintiff demonstrate significant deficits in adaptive

functioning. (*Id*. at 7.) Accordingly, the Commissioner requests that the case be remanded so that the ALJ can order a consultative examination.

I reject the Commissioner's argument and find that a remand is not appropriate. I first note my frustration with the fact that the Commissioner is just now arguing that the judgment of a medical or a psychological consultant is necessary to affirm that J.N.'s adaptive behavior is consistent with IQ test results, citing POMS DI 24515.056.D.2. This was not argued or referenced by the Commissioner in response to J.N.'s first appeal before me. Indeed, in the first case the Commissioner argued that the ALJ's decision which is substantially similar to the one at issue now was supported by substantial evidence. This issue should have been raised in connection with the last appeal, and the attempt to bring it at this late stage of the process does not sit well with me, particularly given the fact that J.N. is a minor. This is addressed in more detail in section II.B.4, *infra*.

In any event, I find that the evidence in the record supports Ms. Baldwin's argument that J.N. meets the capsule definition for mental retardation. I first address the report of Dr. Marten, who diagnosed "Mild mental retardation, provisional" and "Rule out borderline intellectual functioning." (Tr. 139.) The DSM-IV states that "the specifier *provisional* can be used when there is a strong presumption that the full criteria will ultimately be met for a disorder, but not enough information is available to make a firm diagnosis." *See* DSM-IV (1994), "Use of the Manual," at p. 3 (italics in original). The inclusion of a "rule out" diagnosis of borderline intellectual functioning indicates that

Dr. Marten was leaving open the possibility of that diagnosis, but based on the available evidence he had a "strong presumption" in favor of mild mental retardation.

Once the ALJ received Dr. Marten's report, he had a duty to develop the record as to the correct diagnosis if the ALJ believed that the report was not sufficient for the ALJ to decide what J.N.'s diagnosis was. *See Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) ("The ALJ generally must recontact the claimant's medical sources for additional information when the record evidence is inadequate to determine whether the claimant is disabled."); *Baca v. Dept. of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993) ("The ALJ has a duty to fully and fairly develop the record as to material issues."). Since the ALJ chose not to do so in connection with either of his two decisions, the provisional presumptive diagnosis of mild mental retardation remains the current (and only) medical diagnosis in the record.

Instead of developing the record on this issue, the ALJ decided that the "rule out diagnosis" of borderline intellectual functioning was actually the correct diagnosis, and found that "there is little support for a conclusion that [Plaintiff] carries a diagnosis of mental retardation, as evidenced by the testing results reported by the school psychologist or his adaptive functioning." (Tr. 160). This finding constitutes legal error, because the ALJ was not competent to disagree with Dr. Marten regarding J.N.'s diagnosis without input from a psychologist or other medical expert. *See, e.g.*, *Kemp v. Bowen*, 816 F.2d 1469, 1476 (10th Cir. 1987) ("While the ALJ is authorized to make a final decision concerning disability, he cannot interpose his own 'medical expertise' over that of a physician"); *Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996) ("the ALJ

clearly overstepped his bounds when he substituted his medical judgment for that of [an evaluating psychologist]. . ."). Accordingly, I find that the ALJ erred at step two of the decision in rejecting the provisional diagnosis of mild mental retardation.

I also agree with Ms. Baldwin that the evidence in the record regarding deficits that Plaintiff has in adaptive functioning – available to the ALJ on both occasions that he considered the issue – confirms, rather than rebuts, Dr. Marten's presumption that J.N. qualifies for a diagnosis of mild mental retardation. For example, as to self-care and home living, there is evidence in the record that J.N. requires some assistance with regard to dressing (Tr. 36), frequently puts his shoes and shirts on backwards (*id*. 32), cannot brush his teeth or hang up his clothes without help (*id*. 84), and cannot comb, brush or wash his hair without help. (*Id*.)

While the ALJ noted that Ms. Baldwin indicated "that J.N. could not take a bath or shower, brush his teeth, comb or brush his hair, wash his hair, do what he was told most of the time, or accept criticism or correction", he appeared to reject this testimony by stating that "she did not explain why she indicated this, or whether it was a result of [J.N.] being a regular boy or due to his impairments." (Tr. 160.) I agree with Plaintiff that this reasoning is specious and improper. Ms. Baldwin did not need to specifically indicate whether these deficits were due to J.N.'s impairments, because the Function Report form only asks about abilities that are impacted by the child's impairments.

The ALJ also noted that Ms. Baldwin reported to Dr. Marten that J.N. required some assistance with dressing, but discounted this because "Dr. Marten did not follow up with any questions on what she meant by this." (Tr. 160, 164.) However, this was

not a proper ground to reject this evidence. Dr. Marten's lack of follow-up questioning is irrelevant as there is nothing in the record to indicate that he found Ms. Baldwin's statement not to be credible. Further, there is no evidence to rebut Ms. Baldwin's testimony about this. (*Id*. 31.) The ALJ also erred by selectively applied the evidence as to self-care and activities of daily living, pointing to J.N.'s ability to use a zipper, button clothes, choose clothes, and tie shoelaces while discounting or ignoring the other evidence. (*Id*. 160, 164.)

There is also evidence that Plaintiff has significant deficits in connection with functional academic skills. The standardized assessments in the record — where J.N. is compared to other students generally, or the expected achievement levels for students in his grade — all rate his abilities as "below proficient," or "unsatisfactory." (Tr. 242-50.) J.N.'s Individualized Education Plan ["IEP"] in the record also states that J.N. is not proficient on his reading, writing, and math goals." (*Id*. 123.) Indeed, Ms. Baldwin testified at the most current hearing that the teacher told her that J.N., who was then in eighth grade, was reading at a first grade level. (*Id*. 259.) J.N.'s IEP also shows that J.N. needs a scribe for testing and written assignments, and needs extra time to complete assignments. (*Id*.)

The ALJ ignored or discounted the above evidence regarding J.N.'s functional academic skills, instead relying on the fact that "[J.N's] grade reports indicate that he has been rated as either proficient or at least partially proficient in his schoolwork." (Tr. 160.) However, as indicated in my decision in the first case, these grades are all reflective of modified grading and special assistance provided by his school, consistent

with J.N.'s IEP. (*Id*. 123, 259.) The ALJ also relied on J.N.'s grades in the first unfavorable decision, and that rationale was specifically rejected by me in my prior Remand Order. (*Id*. 204.) The fact that the ALJ again chose to rely on these grades without taking into account that they are modified, while ignoring the other evidence in the record that shows significant problems in connection with functional academic skills, is particularly troubling to me.

Finally, there is evidence that J.N. has significant deficits in other areas of adaptive functioning. For example, as to the ability to follow rules, Ms. Baldwin testified that J.N. is unable to follow rules at home, and there is evidence that he cannot do what he is told or complete chores most of the time. (Tr. 84-85). Ms. Baldwin also testified that J.N. is constantly getting into trouble at school for behavioral issues. (*Id.* 260-61.) The ALJ discounted this evidence, citing only to J.N.'s ability to "follow safety rules such as looking for cars before crossing the street." *(Id*. 160.)

There is also evidence as to deficits in J.N.'s social/interpersonal skills. This includes the fact that J.N. is unable to make new friends (*id*. 83), that it is hard for him to get along with others (*id*. and 263), that he is a bully, and that is physically abusive to kids, both at school and at home. (*Id*. 30-31, 83, 262-63.) The ALJ ignored or discounted this evidence, instead relying on one statement in the 2005 IEP which stated that Ms. Baldwin had reported that J.N. played well with kids in the neighborhood. (*Id*. 164.)

It is clear from the foregoing that, as in the first unfavorable decision, the ALJ selectively applied evidence to support a denial of benefits. This error formed part of

the basis for my previous Remand Order, as an ALJ "may not pick and choose among the evidence in the record, 'using portions of evidence favorable to his position while ignoring other evidence.'" *Carpenter v. Chater*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted). (*See* Tr. 207.) The ALJ also cited irrelevant evidence such as J.N.'s ability to get to school on time – a behavior that is strictly regulated by his parents – and his ability to perform physical tasks such as running, walking or throwing a ball, even though J.N. is not claiming a physical disability. (*Id*. 160, 164.)

I also find that the ALJ's decision regarding adaptive functioning is internally inconsistent with his findings regarding the various domains of function used to assess whether J.N.'s level of impairment is "functionally equivalent" to a listed impairment. (Tr. 165-172.) In determining whether a child's impairments functionally equal a Listing, the ALJ must assess the child's functioning in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). To "functionally equal" a Listing, the child's impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. *Id*., § 416.926a(a).

The ALJ specifically found that J.N. has a "marked" impairment with respect to acquiring and using information. (Tr. 166.) I agree with Ms. Baldwin that this finding would appear to mean that J.N. has significant deficits in aspects of adaptive functioning that fall within the domain of acquiring and using information. This domain considers

how well a child acquires or learns information, and how well the child uses the information he has learned. *See* 20 C.F.R. § 416.926a(g); POMS 25225.050.A.

In explaining the domain of acquiring and using information, the Social Security Administration explained that for school age children ages 6 to 12, the child should be able "to read, write, and do math. . .", "to use these skills in academic situations to demonstrate what [the child has] learned. . . ." as well as "in daily living situations. . ." and "to use increasingly complex language . . .to share information and ideas. . . ." POMS 25225.050.B. An adolescent ages 12 to age 18 (the category J.N. now falls in) should "continue to demonstrate what [he or she] ha[s] learned in academic assignments", "be able to use what [he or she] ha[s] learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation)", "be able to comprehend and express both simple and complex ideas, using increasingly complex language . . .", and "learn to apply these skills in practical ways that will help [the child] enter the workplace after [he or she] finish[es] school (e.g., carrying out instructions, preparing a job application. . . ." *Id*. Examples of functional capabilities that are encompassed within this domain include not demonstrating an understanding of words that describe concepts such as space, size, or time, difficulty remembering what was learned in school the day before, not using language appropriate for age, not developing "readiness skills" the same as peers, not reading, writing, or doing arithmetic at appropriate grade level, difficulty comprehending written or oral directions, struggling with following simple directions, talking only in short, simple

sentence, and difficulty explaining things. SSR 09-3p, 2009 WL 396025, at *6 (Feb. 17, 2009).

From the foregoing, it is apparent that the term "adaptive functioning" encompasses many areas that are relevant to the domain of acquiring and using information. Further, I agree with Ms. Baldwin that there is considerable overlap between the functional abilities referenced by 20 C.F.R. § 416.926a(g) and SSR 09-3p and the adaptive areas in which J.N. has well-documented deficits. Accordingly, it does not appear possible to reconcile the ALJ's finding that J.N. has no deficits in adaptive functioning with the finding that J.N. has "marked" limitation with respect to acquiring and using information.

Furthermore, the ALJ found that J.N. is functionally impaired in several other domains of function; specifically, attending and completing tasks (Tr. 167), interacting in relating with others (*id*. 168), and caring for yourself. (*Id*. 171.) Although the ALJ found that J.N.'s impairment in those other domains was not severe enough to be considered "marked," the fact that he found functional impairment in these areas is relevant to the issue of whether J.N. has deficiencies in adaptive functioning that encompasses tasks in these domains. Again, it is not plausible that J.N. could be impaired in such a wide range of functional domains, and yet have no deficits of adaptive functioning as found by the ALJ.

In conclusion on this issue, I find that the ALJ's decision that J.N. does not meet the capsule definition of mental retardation in the introductory paragraph of Listing 112.05 is not supported by substantial evidence. Instead, I find that the evidence in the

record supports Dr. Marten's provisional diagnosis of mild mental retardation, *i.e*, that J.N. has "significantly subaverage general intellectual functioning" with substantial deficits in adaptive functioning. I also note that the ALJ's decision to give Ms. Baldwin's testimony "little weight" as it was "not entirely credible" is not supported by substantial evidence. The ALJ based this decision on the fact that "the evidence supports that [J.N.] has few significant problems" in areas other than intellectual functioning (Tr. 165), which I have found herein is not supported by the record.

3. Whether J.N. Meets the Criteria in Part C of Listing 112.05

I also agree with Plaintiff that substantial evidence in the record shows that J.N. meets the criteria of part C of Listing 112.05. The C criteria requires "a valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. pt. 404, subpt. P., app. 1, § 112.05(C). Here, it is undisputed that Dr. Marten assessed Plaintiff's performance IQ at 59 from his testing in 2006. (Tr. 139.) Further, Dr. Marten opined that his findings "appeared to be a valid representation of [J.N.'s] intellectual and cognitive functioning at this time." (*Id*. 138.) While J.N.'s school performed IQ testing with different results (*Id*. 129) which were relied on by the ALJ, Dr. Marten cogently explained that the school's testing is not inconsistent with his testing, particularly with regard to the performance IQ score. (*Id*. 149-49.) This opinion of Dr. Marten is undisputed in the record, and cannot be second guessed by the ALJ based on his own lay opinion as explained in my Order of March 2010 in the first case.

Thus, to the extent the ALJ states that the performance IQ score of 59 achieved in Dr. Marten's testing "is not corroborated by . . . the WISC-IV [testing of the school],. . .

which showed [Plaintiff] had a of 100" (Tr. 160), this is an improper lay opinion of the ALJ. There is no evidence in the record, including Dr. Marten's explanation of the testing, that equates the performance IQ score with the scores from the Perceptual Reasoning Index and Processing Speed Index in the WISC-IV relied on by the ALJ. Dr. Marten stated that the findings of the WISC IV do not invalidate the WISC III findings. (*Id*. 149.) Dr. Marten also stated that the different scores "serve to highlight the relatively different functions performed by the two different test protocols, especially involving the comparison between [J.N.'s] Performance IQ on the WISC III versus that of his Perceptual Reasoning and Processing Speed Indices on the WISC IV." (*Id*.)

The Commissioner argues, however, that IQ scores of 40 or above obtained between the ages of seven and 16 are valid for only two years, citing 20 C.F.R. pt 404, subpt. P, app. 1, § 112.00(D)(10). As a result, he asserts that the tests in the record are no longer a valid representation of J.N's intellectual functioning. I reject this argument. The issue here is whether J.N. met the definition of mental retardation in 2005. Since Dr. Marten's IQ testing was performed in 2006, it was performed within two years of J.N.'s application for disability and met this criteria. If I were to order new IQ testing, it would add nothing to the issue of what J.N.'s IQ was in 2005 and whether he met the criteria for Listing 112.05 in that year. The Commissioner's argument speaks more to whether a Continuing Disability Review ["CDR"] might be applicable at some point, 20 C.F.R. § 416.994a, rather than whether J.N. was entitled to disability benefits at the time the claim was filed on his behalf. Obviously, the Commissioner has the discretion to

conduct a CDR at the appropriate time, but a future assessment of whether J.N.'s condition has *improved* should not delay the final decision on his initial entitlement.

4. The Appropriate Remedy

The final question is whether the ALJ's decision should be reversed outright with an award of benefits or whether the case should be reversed and remanded to the Commissioner for further fact finding. The Tenth Circuit has made clear that when an ALJ decision is reversed on appeal, it is within the sound discretion of the Court whether to remand for additional proceedings or for an immediate award of benefits. *Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir. 1993); 42 U.S.C. § 405(g). "Some of the relevant factors [to] consider are the length of time the matter has been pending and whether or not given the available evidence, remand for additional fact-finding would serve [any] useful purpose or would merely delay the receipt of benefits." *Salazar v. Barnhart*, 468 F.3d 615, 626 (10th Cir. 2006) (internal quotes and citations omitted). A remand for an immediate award of benefits "is appropriate when the record fully supports a determination that Plaintiff is disabled as a matter of law and is entitled to the benefits for which he applied." *Sorenson v. Bowen*, 888 F.2d 706, 713 (10th Cir. 1989).

In the case at hand, I agree with Ms. Baldwin that this case should be reversed for an immediate award of benefits rather than remanded for further factfinding. I find that the record fully supports a determination that J.N. is disabled as a matter of law pursuant to Listing 112.05C as discussed in Section II.B.2 and 3, *supra*, and is entitled to the SSI benefits for which he applied.

I also find that the additional development proposed by the Commissioner (ordering a consultative examination and obtaining new IQ testing) would not "serve any useful purpose, but would merely delay the receipt of benefits." *Salazar,* 468 F.3d at 626. Dr. Marten already performed a consultative examination at the Commissioner's request in June 2006. (Tr 136-41.) He provided a detailed report regarding his findings and conclusions at that time, and subsequently provided additional evaluation and analysis of the underlying IQ scores in comparison to other scores obtained by J.N.'s school. (*Id*. 148-50.) It would be inappropriate to delay the final decision regarding J.N.'s claim merely to obtain a new evaluation that could be duplicative and/or provide little to no guidance on the issue of JN's IQ scores in 2005.

I further note that the ALJ's previous decision was reversed and remanded by me in March 2010 on the basis of many of the same errors that are present in decision at issue. Thus, the Commissioner has had numerous opportunities to properly evaluate this case but has not done so, despite my previous Order of Remand. I do not believe that another remand would rectify the problems or accomplish anything, particularly given the fact that the record fully supports finding that J.N. is disabled.

In a similar vein, the actions now proposed by the Commissioner could have been undertaken in connection with the remand of the first case, had the Commissioner deemed them appropriate at that time. The fact that the Commissioner only now believes he should have developed this claim further – after two appeals and six years after the claim was initially filed – should not inure to J.N.'s detriment. The Tenth Circuit has repeatedly admonished that the Commissioner "is not entitled to adjudicate a case

ad infinitum until he correctly applies the proper legal standard and gathers evidence to support his conclusion." *Sisco v. U.S. Dept. of HHS*, 10 F.3d 739, 746 (10th Cir. 1993).

Finally, I agree with Plaintiff that the Commissioner should not be permitted to tangle a children's claim in a procedural morass until the child becomes an adult and can no longer benefit from the children's SSI program. J.N.'s claim for children's SSI benefits was initially filed in December 2005, and has now been pending for more than six years. The remedy proposed by the Commissioner in this case could entirely subvert the purposes of the children's SSI program, *i.e.*, to assist indigent disabled children and their parents *while the child is being raised*. "Congress included disabled children under the somewhat more generous Supplemental Security Income program in the 'belief that disabled children who live in low-income households are certainly among the most disadvantaged of all Americans and that they are deserving of special assistance in order to help them become self-supporting members of our society.'" *Zebley by Zebley v. Bowen*, 855 F.2d 67, 69 (3d Cir. 1988) *aff'd sub nom. Sullivan v. Zebley*, 493 U.S. 521 (1990) (citation omitted). J.N. is already 16 years of age, and it is imperative that he receive a final decision regarding his claim before he becomes an adult and is no longer entitled to assistance under the children's SSI program. 20 C.F.R. § 416.987.

## III. CONCLUSION

Based upon the foregoing, it is

ORDERED that this case is **REVERSED and REMANDED** to the Commissioner for an immediate award of SSI benefits to J.N.

Dated June 14, 2012

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge